Good morning. Members of the court, may it please the court counsel. My name is Daniel Marks. I represent our felon, Cynthia Gilliam, who is the plaintiff below. Your honors, there were two issues below. One was the standard review, which the district court, after a three-page analysis, correctly ruled that the district court would exercise de novo review. And even though the Nevada Power Company did not appeal that on a cross appeal, a lot of their brief is still arguing for a different standard. The issue with the cross appeal, should we address it at all? I don't think you should, but I just wanted to indicate that. In contrast to that three-page analysis, the district court, in the issue that's before you regarding whether severance, vacation, and other payments constituted wages for purposes of the plan, there's a one-page, a one-paragraph conclusion by the district judge. Well, district judge doesn't have to do a reasoned opinion in deciding summary judgment. Is that one paragraph conclusion correct? We don't think it's correct for this reason. Why not? For 60 years, the courts from the Supreme Court or the court of claims all the way up to the U.S. Supreme Court has taken an expansive view of the employer-employee relationship and the definition of wages as it relates to the IRS code. That has consistently, all the way through a December 2005 opinion by a panel of this court, in the Rivera-Baker case, where there was an issue regarding whether Title VII settlements after an employee had left employment would be included as wages. But this is wages and salary as determined by the IRS and for federal tax purposes, and so what do you do with Revenue Ruling 58-301? Your Honor, this – a panel of this court concluded even Title VII settlement after someone left employment was wages for IRS purposes. What do you do with 58-301 is the question. I believe that's consistent with our position because up until, again, all the cases that we have cited on ERISA, Title VII, whether or not someone's working or not was voluntarily terminated or involuntarily, and we believe she was involuntarily terminated. We believe the record is clear on that, and that's their only argument in their opposing brief. Let me throw you a curve here because if we don't get this in, we're going to lose something. This is a contract interpretation. It has nothing to do with the IRS at all because we have to interpret what the contract terms. We're talking about service earnings. We're talking about earnings. And the plan states, which we're doing, it means box W-2, box 1. Box 1 is the only way income is to be reported by the company to the IRS. Box 1, when they identify earnings, it's the company as it reports it on its W-2. It has nothing to do with the interpretation by the IRS. Why are we talking about the IRS at all? We don't have to go to the IRS rulings because we're determining what the contract says. The contract says if you want to find out how much it is, look in box 1. It has nothing to do with interpretation by the IRS that I can say. I don't disagree with that. All I'm pointing out is the definition. Why should we deal with rev rulings? The death or tax cases. This is not a tax case as far as I know. You're correct. I don't disagree. What happened was the definition says total wages and salaries for Federal income tax purposes for the calendar year, box 1, W-2 income. That's right. And that was our position below. All of the briefing is looking for an interpretation of what is wages. We service the – it's what is service earnings. The contract says service earnings is what we're talking about. Which they define as, quote, total wages and salaries for Federal income tax purposes for the calendar year. I don't disagree. We thought below that the plain language of the plan supported our view because all the service earnings were in box 1 on the W-2, and my client was employed during the whole time, and we thought, based on that law, it was extremely simple and straightforward. What I was pointing out in terms of the distinction of the decision by the district judge, who I have great respect for, there was a lot of analysis on an issue that's not in front of you. There was no citation of any case at all, and there's numerous case law that we think over 60 years, the courts in all sorts of contexts, and I'm just pointing out, whether you're talking about revenue context, whether you're talking about Title VII cases, whether you're talking about someone who leaves voluntarily or involuntarily and sues and gets a judgment, whether somebody settles and is not working. In all of those contexts, the courts have, over a 60-year period, consistently held that money is wages for Federal income tax purposes and you don't have to go there. I understand. Not only you don't have to go there, I'm having a hard time getting outside of the contract. Okay. Because this happened because this particular individual was employed by the company under employment contracts, they had a retirement plan, and we're not worried about tax implications at all. I'm dragging in the interpretation, then I'm going to have to start rethinking it. I'm not going there, Your Honor. But in your brief, you said earnings in the plan documented as wages is defined by the Internal Revenue Service. Earnings and salary reported for Federal income tax. As defined by the Internal Revenue Service. And that was your language. That's how I got under the idea. And that was to meet the various definitions of wages that were raised by Nevada powers to why they claim it wasn't wages for purposes of the plan. Our initial argument below, which we don't believe was ever contradicted by anyone, was that the plain language of the plan supports the position that these payments should have been includable in the plan because they were under the plan definition of total wages and salary for the calendar year. If the contract is not ambiguous in saying earnings means a participant's total wages and salary as reported by the company for Federal income tax purposes for the calendar year, then why would we go outside and seek an interpretation of wages from some other source? I'm not suggesting you should, Your Honor. Excuse me? I'm not suggesting you should. Because when you're talking about internal revenue, so we're not worried about what internal revenue thinks about wages. That's correct. We argued below that it should be a strict interpretation of the plan documents and the contract. And that was our position. Okay. What I was pointing out is there was the district court ruled against us without citing any cases or any authority. And based on that, I think that led to everyone searching for definitions. So bottom line is your view is what's in box one controls. Yes, Your Honor. All right. Let's hear from the other side, and then you can reserve your remaining time. Thank you, Your Honor. Good morning, Your Honor. It's James Harris on behalf of Applebee's. The Benefits Committee in the district court correctly determined that the one-time extraordinary payment to the plaintiff to buy her out of her long-term employment contract was not wages or salary, as commonly understood, and therefore did not need to be considered in her pension calculation. And we talk about the atmosphere in which that happened. It seems as though there was a downsizing going on after the merger with Sierra Pacific, or contemplating that. And she was given an option to, if you will, take early retirement with the of the severance pay, and then later on, of course, she could collect under the Nevada Power retirement plan. Yes. Now, she wasn't fired. She was not fired. And at the time that they went into their agreement to make this thing work, she was given, as I read it, she was given a salary in April. It was, I think it was April of 1999 when they got into this agreement. And then she was given a salary as an inactive employee until June. End of June, yes. Okay. Now, I couldn't find in the record when they paid the severance pay. It was during that period, between April and June. Is there anywhere in the record that says they did that at that time? I recall seeing that in the record. I don't have a site to attend. The reason I say that, let's just follow that through. If she's getting a regular salary as an inactive employee, she was getting whatever she was supposed to get, and then they put another payment on top of it during that period when she's an inactive employee, does that make that payment wages? No. I think to determine whether it's wages, you have to look to what the nature of the payment was. Rather than when it was paid. Yes. And that could help the employer under certain circumstances and hurt the employer under certain circumstances. But you have to look at the nature of the payment. And the nature of this payment was that it was not wages. It was a payment to buy her out of her long-term contract. It was, as the Administrators and the Committee said below, payment not to work. I think Judge Brunetti's point earlier was that you don't even get there because you look at precisely what the plan says, and you go to there, and you look at the box, and that's the figure. Well, that's the last argument that they make on page 28 of their blue brief after tangling everything up at the IRS. But I think you do need to look, I'll answer that on two levels. When it comes to contract interpretation, I think it's appropriate to take a look at how the contract's been interpreted. The consistent treatment of participants under the plan all throughout have indicated that a termination payment, a voluntary termination payment, is not included in the SIRP calculation. That's the Holm case, the Clays case. Both examples were discussed extensively in the briefs and in the Administrative Record below. And also, if you take a look at the letter from the plan drafter, Mr. Marnell, he has  said that throughout the entire course of the plan, nobody was ever given a payment like this and had it included in their SIRP calculation. So... I have a question. Are we in an ambiguity area here, that the plan isn't clear enough, that we have to go to outside evidence to determine what was done through the plan? I think what you have is conduct that's consistent with our construction of the plan. I'm a little more discreet than that. I'm saying, can we look to the plan document itself in the specific terms in terms of the conclusion you've come to with these practices? I think you have to go outside of the plan to bring in the practices to explain the plan, because box one says everything. Everything's in box one. Well, if I could finish briefly with that. I'll come back to that question in one second. The other piece of evidence that I think is significant with respect to the construction of the plan is the calculation she herself was given at the time of her termination, which showed that the severance package, the severance payment was not going to be included in her... That was after she made her calculation. No, it was previous. In April of 99, when she was getting ready to retire, she was given a series of calculations, all of which showed that the severance calculation was not, the severance payment was not going to be included. She was the so-called expert in her own words on the... Did she contest that at the time? She did not contest it. So I think that is conduct, again, that's consistent with our construction of the plan. Remind me where that is specific in the record, please. Several places. Page 325. I mean, how did they communicate at the time? Memos to her. A memo to her? Yes. And the memo was? There's a memo to her dated April 12th, 1999, page 325. There's a memo to her dated April 13th, 1999, page 346. And there's a post-termination memo to her that's November 19th, 1999, page 280. And these memos actually appear in other places in the record as well. And these all have calculations? That are consistent with the payment that she's been given. None of the dollars actually work out precisely. They're within hundreds of dollars, rather, of our number, rather than within thousands of dollars. But they show that, as the expert, she didn't contest this at the time. So I think it's very powerful evidence. Now, with respect to the meaning of earnings, I think you do need to look to the IRS, because you're talking about what wages and salaries are reportable to the IRS. That's the definition. And I think Revenue Ruling 58-301 is go to the internal revenue. Are you saying that the plan is ambiguous? No, no. I think the plan incorporates that definition by reference. Show me the language that incorporates it. Participants' total wages and salary as reported by the Company for Federal Income Tax. As reported by the company, not as interpreted by the Internal Revenue Service. But the important language is wages and salary. And those are terms of art under IRS law. And those are terms. But this is not a tax case. I know. But you can use an outside definition. Why would you want to use an outside definition? Frankly, there's very little in the record that would explain why this definition was used the way it was, why it was written the way it was used. But this is the definition that we're working with. And both sides concede it's the 1986 plan definition that controls here. Is that correct? It's not the 1999 plan. The 1986 plan. I'm not sure that's the correct year, but it's the Nevada Power Plan. Nevada Power Plan. Yes. Yeah, the one that was adopted in 1986. I think it was 1986. I think that's right. And Revenue Ruling 58-301 is dead on point on this. What it does, if you look at the definition of wages in the Internal Revenue Code, it defines wages as services, as remuneration for services performed. Then you take a look at the regulations interpreting that, and it says that wages are remuneration if paid as compensation for services performed. Then you continue to look, and there's a section that talks about dismissal payments. And it says payments for involuntary dismissals are considered wages, and the negative print of that is that payments for voluntary terminations are not wages. And Revenue Ruling 58-301 is dead on point with that. It says that if a payment is to buy out somebody's contract rights and it's not an involuntary payment for involuntary termination. Your argument would be wrong if the plan said earnings is defined as the dollar number reported by the company for federal income tax purposes. And you're saying by saying wages and salary, then you have to figure out what the wages and salary is. That's right. And back out the severance pay. Right. And that's consistent with the plan generally. I mean, bonuses get a separate treatment. They're to be backed out in part because they may be paid in one year, but they're based on service for another year. And the whole purpose of the plan is to figure out what your earned service was for that particular year, the three-year period. So you automatically have a backing out. I want to stop you there because it's important. Yes. You're now saying that we should rely on interpretations as seen by the Internal Revenue Code on wages to help us determine this. Yes. That's going to bring in some cases that you might not like. I found a case called Riviera v. Baker West, which is a Ninth Circuit law, 2005, 430, Fed 3rd, 1253, interpreting both wages and service for federal income tax purposes. And it recognized that service, which is in this, service earnings, is not limited to work actually done but also includes entire employee or employee relationships for which a compensation is paid. Now, if you want to go there, okay, I was a little concerned about which way folks want to go, but it sounds like you're arguing that we ought to drag in all these cases and the Internal Revenue Code that start talking about wages. Then we're going to be maybe beyond what it seems to be is in the contract if you just stay there. Well. I'm just figuring out where you want us to go or what you want us to think about. I don't know the particular case that you cited, but there's a case that's referenced in, it's not mentioned in the briefs, but it's referenced in the cases that are discussed in the brief. It's an Eighth Circuit decision, the North Dakota State University case. It's 255, Fed 3599. And it goes through all of these revenue rulings that are discussed in the brief. And it says that in the IRS's view, payments for involuntary termination are wages. Payments for voluntary terminations are not wages. In that case, what you had was a university that wanted to buy out the tenured, excuse me, the tenure rate of various professors. And they entered into voluntary agreements. They brought out the professors. And the question was whether the voluntary payment was considered wages. And the Eighth Circuit flatly held that it wasn't, relying on 58-301, which it pointed out is still good law and relied on by the IRS. In that Eighth Circuit case, that's the Dakota State case? Yes. So it might be in conflict with this Riviera case in our circuit. I'm not sure. I'd have to compare the two. Well, I'd have to look at that case. I'd have to look at that case as well. That was 255, Fed 3rd what? 599 at page 603. Because if we're following, I mean, I guess I'm with you, but I guess that means we'd have to start digging into tax law cases relative to wages to interpret this case. Well, and but I think it ends up being an easy determination. What you have here is clearly a voluntary separation agreement. Paragraph 1 of the separation agreement, on its face says she's voluntarily terminating her employment and she's given up all of her rights under the employment contract. There's an express release. There's a waiver of all claims under the employment contract. And there are other indications in the record that her termination was entirely voluntary. I don't think, I'm not too sure. I can't remember what counsel said. I'm not too sure we're arguing voluntary, involuntary. They dispute that. They dispute that it's voluntary. But the record is crystal clear. She signed a form that indicated her termination was voluntary. And in her administrative appeal, she said it was voluntary and that she decided. I have two of that agreement. It says employee agrees voluntarily to terminate. Yes. Yes. And that I think ends up being the dispositive point here. Under the North Dakota case, under 58301, this was a buyout of her employment rights. And it's not a dismissal payment and, therefore, it's not wages or salary. It's a payment not to work and, therefore, it was properly excluded from the pension calculation. Thank you, counsel. Thank you. Mr. Marks, you have some reserve time. Just briefly, we cited the Baker case and we sent a copy to counsel. And the reason we cited it was to show the ever-expanding, not to get into tax law, but to show the ever-expanding definition because of the employer-employee relationship and how expansive the courts are viewing the definition of wages. In a footnote in Baker, the court, and I think it was so simple that the court just put it in a footnote saying the argument in Baker had to do with whether you had to withhold a Title VII settlement, not really applicable. But in a footnote in Baker, they say this is analogous to a severance. And severance, they say, is wages. And that's why we've been arguing these because severance, they say, is wages as it relates to this circuit's definition. And if severance is wages, then we should prevail. In terms of the issue of voluntary and involuntary, that was never really briefed or argued before the district court. But the reason it's significant in our view is while the paperwork says voluntary and you know in an employment context normally someone doesn't want to be fired that's been a high-level executive for 25 years. They want to say it's voluntary. But the provisions for the double bonus and double salary only were applicable in the contract if it was involuntary. So forgetting what it says but what the intent really was, and that's on the plain it's in the contract, the plaintiff, Miscillian, was only entitled to that money, those extraordinary payments, if it was involuntary. And we know that because of the change of control during the merger between Sierra and Nevada Power. In answer to your question about which plan, we all agree that it was the 86th Nevada Power plan. There's no dispute. No one ever claimed below that this plan was ambiguous. Nevada Power always claimed that we should use the plain definition and the contract definition. And we both argued that definition below. The issue regarding all these other tax cases, et cetera, came up on appeal partly because there was no law cited. The district court concluded without analysis or citation that severance was not wages for, you know, for purposes of this case. We're agreeing de novo, so if we decide that or if an argument is persuasive, we have to go to the tax law, we can go to the tax law. Correct. It's de novo. But our position below and our position here, even though it's at the end of the brief, has always been box one. And we went off on those definitions mainly because there was no guidance as to why the court ruled against us on box one. Thank you, counsel. Thank you. The case just Back pay case is what you're saying. All right. We'll make a note of that. Thank you. Footnote does reference severance. And that's what I thought was significant since it was a panel of this circuit as late as December of 05. All right. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: Brunetti, O'scannlain, Trott